# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | | |
|---|---|---|
| ISAAC AVENDANO, *et al.*, | ) | 3:13-cv-00168-HDM-VPC |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| SECURITY CONSULTANTS GROUP, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | June 2, 2014 |

Before the court is defendants' United Government Security Officers of America and United Government Security Officers of America, Local 283 motion to disqualify plaintiffs' counsel (#47).[1] Plaintiffs opposed (#75), and defendants replied (#78). For the reasons discussed below, defendants' motion is denied.

## I.    FACTUAL & PROCEDURAL BACKGROUND

On April 3, 2013, plaintiffs Isaac Avendano and Rolando Duenas ("plaintiffs") filed a complaint against Security Consultants Group, Inc., Paragon Systems, Inc., Securitas Security Services USA, Inc. ("corporate defendants") and United Government Security Officers of America, International Union and United Government Security Officers of America, Local 283 ("union defendants") (#1). In their amended complaint, filed on February 14, 2014, plaintiffs allege that defendants have engaged in retaliation, harassment, and discrimination, and created a hostile work environment due to plaintiffs' race and national origin in violation of Title VII of the Civil Rights

---

[1] Refers to the court's docket number.

Act of 1964 (#58, p. 2).  They also allege breach of contract under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, as well as 42 U.S.C. § 1981 and Nevada state-law claims.  *Id.*

As to the union defendants only, plaintiffs allege that they breached their duty of fair representation of plaintiffs, who were union members, pursuant to NLRA § 301.  *Id.* at 53-57.  Plaintiffs allege that they held positions as federal court security for the corporate defendants.  *Id.*  Following a disciplinary incident, the corporate defendants suspended them without pay; they grieved the employers' actions, and the union defendants represented them in an arbitration with the corporate defendants.  *Id.*  In a July 24, 2012 arbitration award, the arbitrator ordered plaintiffs be reinstated to their previous posts and receive back pay.  *Id.*  The union defendants breached their duty to fairly represent plaintiffs when they failed to pursue the enforcement of the arbitration award.  *Id.*  The union defendants delayed the recovery of plaintiffs' back pay and failed to seek recovery of the full amount of back pay, lost overtime, compensatory time and all other related compensation to which plaintiffs were entitled.  *Id.*  The union defendants failed to challenge the employers' position that any post assignment, regardless of the location, duties, shift, schedule and seniority, was acceptable and in compliance with the award.  *Id.*  Plaintiffs seek compensatory and punitive damages.  *Id.* at 59-60.

On January 17, 2014, the union defendants filed a motion to disqualify John A. Tucker Co., LPA ("Tucker"), plaintiffs' counsel (#47).  They state that Tucker represented the union defendants in 2011 and 2012 in the arbitration of the grievances the union defendants filed on behalf of plaintiffs.  *Id.* at 3.  Therefore, they argue that the Nevada Rules of Professional Conduct prohibit Tucker from now representing plaintiffs against the union defendants.  *Id.*

## II.     LEGAL STANDARDS

Local Rule IA 10-7 provides that an attorney admitted to practice in the District of Nevada shall adhere to the standards of conduct prescribed in the Nevada Rules of Professional Conduct ("NRPC"), unless modified by this court.  Thus, the NRPC generally govern the disqualification of an attorney appearing before this court.  *See In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000); *Ipatt Group, Inc. v. Scotts Miracle-Gro Co.*, 2013 WL 3043677 *5 (D. Nev. 2013).   NRPC 1.9(a) provides that "a lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which the person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  For a potentially disqualifying conflict to exist, the party seeking disqualification must establish three elements: (1) that it had an attorney-client relationship with the lawyer, (2) that the former matter and the current matter are substantially related, and (3) that the current representation is adverse to the party seeking disqualification.  *Nevada Yellow Cab Corp. v. Eighth Judicial Dist. Court*, 152 P.3d 737, 741 (Nev. 2007).

The Nevada Supreme Court has recognized that "[i]n proving that a prior representation is substantially related to present litigation, however, the moving party is not required to divulge the confidences actually communicated, nor should a court inquire into whether an attorney actually acquired confidential information in the prior representation which is related to the current representation.  The court should instead undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter."  *Waid v. Eighth Judicial Dist. Court*, 119 P.3d 1219, 1222-1223 (Nev. 2005) (internal quotations and citations omitted).  That court further determined that a superficial similarity between the two matters is insufficient and that "the focus is properly on the precise relationship between the present

and former representation." *Id.* at 1223.   The Nevada Supreme Court adopted a test that requires that the district court:   (1) make a factual determination concerning the scope of the former representation; (2) evaluate whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters; and (3) determine whether that information is relevant to the issues raised in the present litigation. *Id.*

Finally, if a potentially disqualifying conflict exists, the court must consider a variety of factors before granting a motion for disqualification, including: (1) whether the moving party not only "establish[ed] at least a reasonable possibility that some specifically identifiable impropriety did in fact occur," but "that the likelihood of public suspicion or obloquy outweighs the social interests which will be served by a lawyer's continued participation in a particular case;" (2) "balanc[ing] the prejudices that will inure to the parties as a result of its decision," and (3) imposing disqualification "only after a careful consideration of the client's right to be represented by the counsel of his choice, and the nature and extent of the ethics violation." *Brown v. Eighth Judicial Dist. Ct.*, 14 P.3d 1266, 1270 (Nev. 2000) (abrogated on other grounds by *State v. Eighth Judicial Dist. Ct.*, 321 P.3d 882, 885 (Nev. 2014) (internal citations and quotation marks omitted); *see also Palmer v. Pioneer Hotel & Casino*, 19 F.Supp.2d 1157, 1162 (D. Nev. 1998).

## III.   DISCUSSION & ANALYSIS

In their motion to disqualify Tucker, union defendants state that Tucker acted as general counsel for United Government Security Officers of America ("UGSOA") for almost thirteen years, until May 2012, and Tucker represented the union defendants in the arbitration of the grievances filed on behalf of plaintiffs when they were terminated (#47, p. 3).  They argue that plaintiffs' claims in this case are based on those grievances and the arbitration award.  *Id.*  Union defendants gave Tucker the entire file that they had compiled regarding that case.  Id.  The file contained confidential information and confidential communications with the plaintiffs, witnesses, and union officials.  *Id.*

Tucker and Rachel Baldridge—another attorney with the Tucker firm—were solely responsible for preparing the case and presenting it to the arbitrator at the five-day hearing. *Id*. Union defendants provided confidential information in the form of Local 283 internal documents, discussions with Local 283 President Tim Reynolds, UGSOA confidential documents and discussions with UGSOA employees. *Id*. Tucker and Baldridge created the majority of the confidential information regarding plaintiffs' grievances and arbitration, including legal strategy and notes. *Id*. at 3-4. The union defendants contend that the former matter and the current matter are substantially related, and disqualification is warranted. *Id*. at 6.

The parties do not dispute that Tucker previously represented the union defendants and that Tucker currently represents parties whose interests are adverse to the union defendants. Union defendants next argue that the factors laid out by the Nevada Supreme Court in *Waid*—(1) a factual determination concerning the scope of the former representation; (2) an evaluation of whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters; and (3) a determination of whether that information is relevant to the issues raised in the present litigation—compel the conclusion that the two matters are substantially related. *Id*. at 7. The union defendants state that Tucker had access to confidential information, had sole control over the preparation of the plaintiffs' cases, and that he then appeared on behalf of plaintiffs and union defendants at the grievance arbitration. *Id*. at 8. Plaintiffs now allege that union defendants breached their duty to enforce the award, and union defendants contend that "[t]here can be no question that the two cases are related." *Id*. Union defendants attach the sworn affidavits of Desiree Sullivan, United Government Security Officers of America, International Union ("UGSOAIU") President; Michael Burke, UGSOAIU Regional Director; and Tim Reynolds, an officer with Local 283 (#47, Ex.'s 1-3). Each affiant states that the union defendants provided

Tucker with the entire file related to the grievances and arbitration, that the Tucker firm had complete authority and responsibility to prepare the case and conduct the arbitration hearings, and that he or she had "confidential communications" with Tucker and Baldridge regarding that case. *Id*.

In their opposition, plaintiffs do not dispute that their current counsel, Tucker, along with Baldridge, prepared for and conducted plaintiffs' arbitration on behalf of the union defendants on January 27-28, 2012 and April 13-15, 2012 (#75, p. 2). However, plaintiffs contend that, despite a superficial similarity, the prior and current matters are not substantially related. *Id*. Plaintiffs' position is that the issue in the arbitration was whether plaintiffs and a third grievant were terminated for just cause in December 2010, pursuant to the Collective Bargaining Agreement ("CBA") between the union defendants and defendant Security Consultants Group. *Id*. The Tucker firm represented the plaintiffs and union defendants at the arbitration hearing, which occurred over the five dates indicated above. *Id*. Apparently at the union defendants' direction, the Tucker firm's involvement ceased on May 11, 2012, and union defendants—through other counsel—finalized and filed their post-hearing brief in June 2012. *Id*. at 9. On July 25, 2012, the arbitrator issued a sixty-one-page arbitration award that discussed the evidence presented about the discipline imposed and found that the terminations were not for just cause (#75, Ex. 1). At the conclusion of the order, the arbitrator directs that the "Employer shall offer to reinstate each of the Grievants to a comparable position in the Reno, Nevada area and shall make each Grievant whole for all lost wages (. . . less interim earnings, if any) and other contract benefits, including lost seniority, caused by the improper terminations." *Id*. at 61. The arbitrator also stated that pursuant to the parties' stipulation, he would retain jurisdiction over the "remedy portion of this Award, and any disputes with respect thereto." *Id*.

In October 2012, plaintiffs retained Tucker to represent them, and in November 2012, they brought a case against the union defendants before the National Labor Relations Board.  Plaintiffs alleged that beginning on or about August 2012, union defendants caused or attempted to cause some of the corporate defendants to "adversely affect working conditions, ignore seniority, [and] retaliate against [plaintiffs], and [union defendants] fail[ed] to recover back wages" (#75, Ex. 7). The NLRB charges were eventually withdrawn and advanced as part of this action (#75, p. 3).

Plaintiffs argue that their claim against the union defendants in this action is a NLRA § 301 claim for failing to fulfill their duty of fair representation with respect to the representation of plaintiffs during their reinstatement process and the pursuit and calculation of back pay beginning in August 2012 through about March 2013 (#75, p. 3; #58, pp. 23-27).  Plaintiffs assert that Tucker's current representation is not substantially related to his prior representation of the union defendants (#75, p. 5).  They argue that the two representations are based on entirely different facts, events, documents and legal theories.  *Id.*  Without disclosing specific confidential information, in the prior representation, the union defendants instructed the Tucker firm to arbitrate plaintiffs' grievances regarding their December 2010 termination.  *Id.* at 9.  Union defendants gave plaintiffs' grievance files to the Tucker firm.  *Id.*  Less than a month after the arbitration concluded—and before post-hearing briefing—the Tucker firm's representation of the union defendants ceased, and all files were returned to the union defendants based on their request and indication that they planned to finalize and submit the post-hearing brief and thus conclude the arbitration process.  *Id.*  In the current representation, plaintiffs claim that union defendants breached their duty of fair representation with respect to the reinstatement process and the prompt issuance of all back pay due.  Their claims include that union defendants failed to obtain confirmation of an alleged government directive (the employers provided security at federal sites in Reno) prohibiting plaintiffs from returning to their

original posts or other posts in Reno; failed to keep plaintiffs apprised of the status of their back pay and reinstatement; delayed their back pay recovery; and failed to return to the arbitrator to resolve the issues surrounding reinstatement to comparable posts and calculation of back pay (#58, pp. 54-56).  The facts giving rise to these claims began after the arbitrator issued his opinion and award. For example, the facts giving rise to the claims about failure to pursue full back pay began with plaintiffs' submission of tax returns to union defendants for the purposes of back pay calculation in August 2012 (#75, pp. 6-9).

Plaintiffs argue that the arbitration consisted solely of evidence related to whether plaintiffs were disciplined for just cause under the CBA.  They contend that it would have been impossible to have already discussed legal strategy, created notes, etc., pertaining to the calculation and enforcement of a remedy that had yet to be awarded.  They argue that it is nonsensical to contemplate that union defendants hired the Tucker firm to represent them in the arbitration and at that same time discussed with Tucker a hypothetical intention to not pursue full back pay and reinstatement to former posts on behalf of plaintiffs *if* the arbitrator were to award back pay and reinstatement.  *Id*. at 9-10.  Plaintiffs assert that at the time the Tucker firm's representation of the union defendants ceased, the firm was aware only that union defendants intended to pursue and conclude the merits arbitration by submitting the post-hearing brief.  *Id*. at 4.  Plaintiffs point out that the affidavits in support of the motion to disqualify merely set forth vague allegations that the Tucker firm was privy to confidential information and communications.  *Id*. at 5.  They argue that the union defendants do not assert nor offer any evidence to demonstrate any prejudice or harm to them in the present action.  *Id*. at 5.

In support of their opposition, plaintiffs provide the sworn affidavit of John A. Tucker (#75, Ex. 3).  Tucker attests that he served as of counsel to UGSOAIU and represented that union as well

as the interests of Local 283, the two plaintiffs, and a third grievant in the arbitration in question.  *Id*. at 1-2.  Tucker was never given information regarding plaintiffs' old posts or lost wages in the file union defendants gave him for the arbitration.  *Id*. at 2.  The hearing was bifurcated, and the parties only presented evidence on the merits.  *Id*.  No evidence was presented regarding calculations of back pay or reinstatement issues.  *Id*.  At the time of the hearing, it was UGSOAIU's position that the plaintiffs should be reinstated and made whole in every way, including full back pay, benefits, perks, and lost seniority.  *Id*.  This position was not confidential and was stated in front of the employer and the arbitrator.  *Id*.  Tucker had no discussions with union defendants or anyone else regarding any more detailed plans of the UGSOAIU with respect to any remedy or any plans or intent to enforce any arbitration award that might issue.  *Id*. at 2-3.  After May 11, 2012, the arbitration file was returned to UGSOAIU, and Tucker had no further involvement in the matter or discussions with UGSOAIU or their attorney Robert B. Kapitan.  *Id*. at 3.  At no time did Tucker have any communications with Ms. Sullivan, Mr. Burke, Mr. Reynolds or anyone else at the UGSOAIU or Local 283 regarding (1) their plans to respond to the employers' claims in or after August 2012 that plaintiffs were not permitted to return to their former posts; (2) their understanding or evaluation of what the arbitrator meant by "comparable post" in his July 24, 2012 award; or (3) evidence or calculation of plaintiffs' back pay.  *Id*.  In or about October 2012, plaintiffs retained Tucker to represent them in their claims against the union defendants for failure to represent plaintiffs in events that began in or about August 2012 pertaining to reinstatement, calculation of back pay, treatment at work, and violations of seniority.  *Id*.

Plaintiffs also provide the sworn affidavit of Rachel R. Baldridge (#75, Ex. 4).  She attests that she was hired by the Tucker firm as an independently contracted attorney to prepare for and assist in the arbitration for plaintiffs and the third grievant.  *Id*. at 2.  Ms. Baldridge states that she

did not discuss or participate in discussions with the union defendants, Tucker, or anyone else regarding strategies or facts related to any award that might result from the arbitration. *Id*. She did not learn any confidential information from any communications that she had with Tucker or union defendants that is relevant or useful to the current litigation. *Id*. The only Local 283 leadership with whom she communicated was Tim Reynolds, and she did not learn any information through that contact that is relevant or useful to the current litigation. *Id*. She attended and participated in the five-day arbitration hearing. *Id*. All testimony and exhibits that Ms. Baldridge prepared for the hearing related to the merits of the case, *i.e.*, whether the grievants were terminated for just cause. *Id*. She did not prepare or receive any documentation pertaining to any remedy, and no remedial issues were discussed during the course of the arbitration hearing or any other time. *Id*. She was not involved with any matters pertaining to the UGSOA after the representation terminated on May 11, 2012. *Id*.

The court notes at the outset that when counsel subsequently takes on a representation that can in any way be viewed as "switching sides," such representation certainly raises significant ethical concerns. However, a motion to disqualify presents the court with a delicate and sometimes difficult balancing task between the individual's right to be represented by counsel of her choice, each party's right to be free from the risk of even inadvertent disclosure of confidential information, and the public's interest in the administration of justice. *Brown*, 14 P.3d at 1269–70. Close cases should be resolved in favor of disqualification. *Palmer*, 19 F.Supp.2d at 1162. At the same time, "[m]otions to disqualify face 'particularly strict judicial scrutiny' . . . because there is a significant possibility of abuse for tactical advantage." *Kelly v. CSE Safeguard Ins. Co*., 2010 WL 3613872 *1 (D. Nev. 2010) (quoting *Optyl Eyewear Fashion Int'l Corp. v. Style Cos., Ltd*., 760 F.2d 1045, 1050 (9th Cir. 1985); *see also Hackett v. Feeney*, 2010 WL 4102911 (D. Nev. 2010) (unreported)

("Tactical considerations often motivate such motions."). "District courts are required to use caution in order to prevent parties from misusing motions for disqualification as 'instruments of harassment or delay.'" *Arteaga v. Hutchins Drywall, Inc.*, 2011 WL 219918, at *2 (D. Nev. 2011) (quoting *Brown*, 14 P.3d at 1270); *IN–N–OUT Burger v. In & Out Tire & Auto, Inc.*, 2008 WL 2937294 *3 (D. Nev. 2008); *see also Richardson–Merrell Inc. v. Koller*, 472 U.S. 424, 436 (1985) (expressing concern about the "tactical use of disqualification motions to harass opposing counsel").

At first blush, the union defendants' statement that the Tucker firm represented them in plaintiffs' arbitration and now represents plaintiffs *against* the union defendants in matters relating to that very arbitration appears to leave little room for a conclusion other than that the two matters are substantially related. However, the moving party bears the burden of establishing an ethical violation or other factual predicate upon which the motion depends. *See United States v. Walker River Irr. Dist.*, 2006 WL 618823 (D. Nev. 2006). Here, union defendants state that plaintiffs' claims in this litigation are based on the grievances and arbitration award and that "[t]here can be no doubt that the firm's representation of the union defendants is substantially related to this case" (#47, p. 3). They claim that the Tucker firm acquired confidential internal documents, had confidential discussions and created confidential legal strategy and notes regarding the plaintiffs' grievances and arbitration. *Id.* at 4. They state that "[o]bviously, the exact nature and description of the confidential information cannot be disclosed here." *Id.* While that may be true, the union leaders' affidavits state only generally that the Tucker firm had access to the entire, confidential file for the arbitration. UGSOAIU President Sullivan stated "[d]uring the pendency of that case, I had confidential communications with the Tucker firm regarding the facts and legal strategy of the case" (#47, Ex. 1). UGSOAIU Regional Director Burke stated that he spoke several times with Tucker and Baldridge "regarding the case and those discussions included confidential information," that he "attended one

-11-

of the hearing dates for the arbitration," and that "[d]uring that hearing, I had confidential communications with John Tucker and Rachel Baldridge regarding the case" (#47, Ex. 2). Local 283 officer Reynolds attests that he attended all five hearing days for the arbitration of the grievances and that "[d]uring that time, I had numerous confidential communications with John Tucker and Rachel Baldridge regarding the grievance and arbitration cases" (#47, Ex. 3).

Plaintiffs correctly characterize these as "very generalized affidavits" that set forth only vague allegations of confidential communications. The affiants state only generally and with no elaboration that the Tucker firm was provided confidential information regarding the grievances and arbitration, and they do not assert, even in a conclusory manner, that the Tucker firm was provided confidential information that relates to *this* litigation.

In a 2008 District of Nevada decision, the court considered whether to grant IN-N-Out Burger's motion to disqualify Michael Rounds, counsel for In & Out Tire & Auto, Inc. because he and an associate had briefly worked on a prior matter for IN-N-Out Burger. *IN-N-Out Burger v. In & Out Tire & Auto, Inc.*, 2008 WL 2937294 (D. Nev. 2008) (not reported). The out-of-state counsel who had recruited Rounds as local counsel for IN-N-Out Burger stated in his affidavit that he had had six detailed discussions with Rounds in the course of his representation of IN-N-Out Burger in the prior matter and that they discussed confidential information related to the factual background, legal claims and issues, strengths and weaknesses of their claims and additionally that out-of-state counsel had disclosed certain confidential information about the types of trademark infringement cases IN-N-Out Burger typically pursued and their general trademark infringement litigation strategy. *Id.* at *2. Rounds, on the other hand, advised IN-N-Out Burger that his time notations did not support out-of-state counsel's contentions and that his firm had billed only one hour of one associate's time to review and minimally edit a complaint. The time notations of both attorneys

were provided to the court.  The court concluded that no documentation supported the contentions that detailed and substantive discussions took place about various aspects of the prior matter.  *Id*. at *4.  The court noted that the moving party need not divulge actual confidences, but that the court may "undertake a realistic appraisal of whether confidences might have been disclosed in the prior matter that will be harmful to the client in the later matter."  *Id*. (internal quotations and citations omitted).  The court concluded that no evidence demonstrated that Rounds's prior representation involved anything more than making a few cosmetic changes to the complaint and found that it was "implausible" that out-of-state counsel would have divulged confidential information to Rounds regarding IN-N-OUT Burger's philosophy, approach, attitude, goals and litigation and/or settlement strategies for handling trademark matters in those initial consultations.  *Id*.  Thus, the court found that IN-N-OUT Burger had failed to meet its burden in demonstrating that the two matters were substantially related.  *Id*.

Here, union defendants present evidence—albeit in the form of vague, generalized statements—that the Tucker firm acquired confidential information in the course of representing the union defendants in the arbitration.  However, in undertaking a "realistic appraisal," the court finds it implausible that in the course of the arbitration of the issue of whether plaintiffs were disciplined for good cause, union defendants disclosed confidential information to the Tucker firm about any intention or plan to act in good or bad faith in calculating and pursuing back pay and in determining the meaning of reinstatement to "comparable" posts—remedies that had yet to be imposed.  As plaintiffs point out, union defendants have provided no evidence to suggest otherwise.  In fact, the affidavits all expressly reference confidential information regarding "that case," *i.e*., the arbitration only.  No affidavit states—even in a conclusory manner—that the Tucker firm acquired confidential

information that relates to the current claims regarding back pay calculation and reinstatement to comparable posts (*see* #47, Ex.'s 1-3).

Moreover, in their reply in support of their motion, union defendants still respond only with an entirely unsupported and conclusory statement: "Of course information regarding lost wages is part of the arbitration. After all the grievances sought back pay" (#78, p. 3). The court finds that this is insufficient and utterly fails to address plaintiffs' position that the Tucker firm represented the union defendants at the arbitration on the merits regarding whether plaintiffs were disciplined for good cause, that the firm ceased representation of the union defendants before the arbitration had concluded, and that the prior representation does not substantially relate to Tucker's current representation of plaintiffs who now claim the union defendants breached their duty of fair representation of plaintiffs by failing to pursue full back pay and comparable reinstatement that was awarded at the conclusion of the arbitration. Union defendants note that the question before the arbitrator was "Did the Employer have just cause to terminate the Grievants; and if not, what is the appropriate remedy?" (*id.* at 6; #75, Ex. 1, p. 2). However, they fail to respond to plaintiffs' statement that the subsequent representation relates only to the union defendants' actions with respect to the calculation and pursuit of back pay and the interpretation and implementation of reinstatement to comparable posts.

The court notes that current counsel for the union defendants filed a complaint regarding Tucker's representation of the plaintiffs with the Disciplinary Counsel of the Supreme Court of Ohio (#75, Ex. 18). The Ohio Rules of Professional Conduct contain the identical Rule 1.9 as the NRPC, which prohibits a lawyer who has formerly represented a client from representing another person in a substantially related matter in which that person's interests are materially adverse to those of the former client without the informed, written consent of the former client. In an October 2013 letter to

current union counsel Kapitan, Ohio Supreme Court Assistant Disciplinary Counsel Stacy Solochek Beckman stated that there was no question that since the relationship between the Tucker firm and union defendants ended, the Tucker firm has represented clients whose interests are directly adverse to the union defendants, including plaintiffs and a competing union.  *Id*.  However, she concluded that none of these subsequent matters appears to be substantially related to any of the matters the Tucker firm pursued on behalf of the union defendants.  Beckman added that "there is no evidence suggesting that Ms. Baldridge or Mr. Tucker used any client confidences gained during their representation of UGSOA in an improper manner . . . . It would be improper to automatically preclude Ms. Baldridge or Mr. Tucker from representing clients in other union or labor matters merely because they once represented UGSOA." *Id*.

Finally, the court observes that on November 29, 2013, in an unrelated matter, Tucker filed a petition for another union to be included on the ballot in an election with a UGSOAIU local union in Houston, Texas (#75, Ex. 23).  Current union defendants' counsel Kapitan acknowledges in his affidavit that it was at about that time that his clients decided to file a motion to disqualify the Tucker firm from this case (#75, Ex. 17, ¶¶ 11-12).

In any event, the union defendants have provided only vague, conclusory affidavits in support of their contention that the two matters are substantially related.  But a superficial similarity between the two matters is not sufficient to warrant disqualification, and the court simply cannot conclude that union defendants have met their burden in demonstrating that the two matters are substantially related.  Accordingly, the motion to disqualify the Tucker firm is denied (#47).

## IV.  Related Motions

Plaintiffs' motion for leave to submit documents in support of their opposition to the motion to disqualify for *in camera* review (#76) is therefore denied as moot.   Defendants United

Government Security Officers of America and United Government Security Officers of America, Local 283 also filed a motion to strike, which—despite its incorrect title and introduction—the court has discerned seeks to strike two exhibits that plaintiffs included with their opposition to the motion to disqualify (#82).  The first exhibit is the redacted grievance file that came into the Tucker firm's possession when it represented union defendants, and the second exhibit is certain redacted invoices that the Tucker firm submitted to union defendants for its legal services (#75, Ex.'s 10, 11). Defendants argue that NRPC 1.6 protects all client information from disclosure.  *Id*. at 3.  Candidly, the court sees as little point in filing invoices that are completely redacted except for indicating that it was a bill from the Tucker firm to union defendants as it sees in now striking such documents. However, in an abundance of caution, the court will err on the side of protecting client information from disclosure.  As such, defendants' motion to strike exhibits 10 and 11 from plaintiffs' opposition to the motion to disqualify counsel is granted.

## V.  Conclusion

**IT IS THEREFORE ORDERED** that defendants' United Government Security Officers of America and United Government Security Officers of America, Local 283 motion to disqualify plaintiffs' counsel (#47) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiffs' motion for leave to file documents for *in camera* review (#76) is **DENIED** as moot.

**IT IS FURTHER ORDERED** that defendants' United Government Security Officers of America and United Government Security Officers of America, Local 283 motion to strike exhibits 10 and 11 from plaintiffs' opposition to the motion to disqualify (#82) is **GRANTED**.  These two exhibits are **STRICKEN**.

**DATED**:  June 2, 2014.

_____
**UNITED STATES MAGISTRATE JUDGE**

-16-